(C.D. 2067)

HAROLD J. COHEN
EAST COAST RADIO & TELEVISION CO., INC. } *v.* UNITED STATES

## United States Customs Court, Second Division

(Decided February 18, 1959)

*Harold J. Cohen; George Cheren (Robert Golden of counsel) for the plaintiffs.*
*George Cochran Doub, Assistant Attorney General (Murray Sklaroff, trial attorney), for the defendant.*

### Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: Two importations of merchandise described on the invoices covered by the above two protests, which were consolidated for trial, as "Radio Condensers" and "Electrica Minitrop Condensers," were classified by the collector of customs as "Articles in chief value of metal, suitable for controlling or modifying electrical energy, other," as provided in paragraph 353 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 353), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, and duty was imposed thereon at the rate of 15 per centum ad valorem.

Plaintiffs contend that the merchandise is more specifically provided for in said paragraph 353, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, as parts of radio or television apparatus and properly dutiable at the rate of 12½ per centum ad valorem.

The pertinent provisions and statutes involved herein are set forth below—

Paragraph 353, as modified by the General Agreement on Tariffs and Trade, *supra*:

Articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy, and articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs; all the foregoing (not including electrical wiring apparatus, instruments, and devices), finished or unfinished, wholly or in chief value of metal, and not specially provided for:

> Switches and switchgear which are not wiring apparatus, * * *

\*      \*      \*      \*      \*      \*      \*

> Other articles (except machines for determining the strength of materials or articles in tension, compression, torsion, or shear; flashlights; batteries; vacuum cleaners; and internal-combustion engine)_____ 15% ad val.

Paragraph 353, as modified by the Torquay Protocol to the general agreement, *supra*:

Electrical signaling, radio, welding, and ignition apparatus, instruments (other than laboratory), and devices, finished or unfinished, wholly or in chief value of metal, and not specially provided for (not including television apparatus, instruments, or devices) _____ 12½% ad val.

Articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs, finished or unfinished, wholly or in chief value of metal, and not specially provided for:

    Batteries * * *

  *        *        *        *        *        *        *

    Television apparatus _____ 12½% ad val.

Parts, finished or unfinished, wholly or in chief value of metal, not specially provided for, of articles provided for in any item 353 of this Part (not including X-ray tubes or parts thereof) __ The same rate of duty as the articles of which they are parts

The imported merchandise, being of various sizes, is represented by exhibits 1 and 2.

At the trial, Harold J. Cohen, who is the plaintiff-importer of the merchandise to which protest 307911–K relates, appearing as a witness in his own behalf, testified that he had been engaged in the electronics field for about 20 years, having received a preliminary education in radio in the War Defense Management Courses prior to World War I and had completed two courses in radio. He had been a carrier and repeater technician and chief carrier technician with the United States Signal Corps, where he had under his supervision some 40 technicians in the repair maintenance of carrier telephone and telegraph equipment for the Government. After his discharge from military service, he engaged in the radio and television business, which he has operated under the name of Television Installation Co. for 8 years as chief technician and general manager of the business. He displayed an intimate knowledge of the use of various electronic components and parts and with their terminology and technology in the industry.

Based upon his knowledge, observation, and experience, it was his testimony that the subject merchandise was sold to customers in the radio and television parts business who sell to the radio repairmen and television repairmen. He had seen the articles used on television sets and radio sets as repair parts and knew of no other application having been made of these particular condensers. Cohen's testimony applies to the merchandise represented by both exhibits 1 and 2, which are known in the electronic industry either as capacitors or condensers.

With respect to their use, Cohen stated that they were employed as coupling condensers, their purpose being, as stated by the witness, "to join one stage of possibly an amplifier circuit or similar electronic circuit to the next, permitting the passage of an alternating current signal and blocking the passage of a direct current, which the alternating current signal superimposed upon." When used as a bypass condenser, its purpose is "to shunt undesirable components in the signal to two ground potentials, so that they won't be passed further on to the desirable parts of the circuit." When so used, they control electricity through a circuit.

Plaintiffs' witness, Bernard C. Peddy, testified, in substance, that he had been in the electronics business for 35 years, engaged in repair service, both military and civilian, being presently engaged as purchasing agent for an electronics manufacturer; for the past 12 years, he had been purchasing agent for electronics parts; was familiar with the merchandise represented by exhibits 1 and 2, having purchased it and used it; had worked with all forms of electronic equipment, including military equipment; and, during the past war, was in charge of the radio laboratory in Key West, Fla., where he was engaged in the installation and maintenance of radar and sonar. Based upon his knowledge and experience, he stated that 98 per centum of the total quantities of the subject merchandise had been used for maintenance and repair of radio and television equipment. While he had not seen them used in the manufacture of television sets, he had seen them used in the repair of such sets.

Plaintiffs' witness, Henry Fine, stated that, for 10 years, he had been secretary-treasurer and 50 percent owner of the East Coast Radio & Television Co., Inc., one of the plaintiffs herein, who is a wholesale distributor of radio and electronic supplies; that his customers were the radio and television servicemen, radio and television stations, airlines, Government activities, schools, and many other types of business using electronic component parts; he had purchased condensers, such as exhibit 2, for resale to the radio and television servicemen in the Miami area. The witness had negotiated for the purchase of the merchandise in Germany where he visited the factory; that it was made for the express purpose of resale or for use in radio and television, and his company sold it for the purpose of repairing radio and television sets and for no other purpose, although efforts have been made to sell them for other uses.

Plaintiffs' witness, Henry M. Young, testified, in substance, that he graduated as a radio engineer from New York University in 1934. After working about 8 years with concerns manufacturing condensers and transformers, he was in the Air Force for 3 years, in the capacity of an instructor at a radio school in Scott Field, Ill., for 1 year and later served as a radio operator aboard a B-29. Upon leaving the

service, he took a 2-year course in television and, for the past 6 years, has been engaged in servicing televisions. He testified to his knowledge and experience with merchandise represented by exhibit 2, stating that he had used it to repair radio and television sets and knew of no other use for the commodity.

The defendant called as its witness, Carroll I. Carman, a sampler and acting examiner in the United States Appraiser's Office in Miami, Fla. His testimony discloses that he had been in the radio and television business for about 20 years and holds an amateur radio operator's license; had been employed by several companies to work on radio and television and had installed automatic pilots in aircraft; he had become familiar with the merchandise represented by exhibits 1 and 2 as an examiner of merchandise and had used it personally "for radio, TV, * * * noise filter circuits on AC lines" and "in limited circuits, in replacement of condensers in a simple electronic timer for photo work, and many other little applications where the tolerance between these and the American condensers didn't matter too much." He described a filter circuit as a small device which is hooked onto the radio; an electronic timer as a device comprising tubes and condensers and resistors, which are set to indicate an elapsed time "when your points were opened and closed, and break, or break a circuit, returning the timer off." Thus used, however, stated the witness, it has nothing to do whatever with TV.

On cross-examination, it appears that Carman was not engaged in the general business of repairman but did his work strictly at his home. He stated that when the electric timers had been brought to him for repairs, they had been equipped with an American-type condenser similar to the imported condenser but that he had never seen any electric timers with condensers such as exhibits 1 and 2 except when he had put them in the timers himself. However, he admitted that he had never seen them in commercial use for that purpose.

It is the contention of plaintiffs that the condensers in controversy are chiefly used in radio and television sets and that they are not suitable or desirable for use in any other type of electronic equipment, largely because of the fact that the tolerance of the condensers, which varies from 10 to 30 per centum, would render them unreliable and unsatisfactory. The witness Fine testified that the tolerance required for condensers in electronic computers was plus or minus 1 per centum, the same degree of tolerance that is required with airlines, except for ground radio equipment. The tolerance of the imported condensers would disqualify them for use in I.B.M. equipment or in physiotherapy electronic devices.

The witness Young testified that the imported condensers could not be availed of in any equipment where ultra-high frequency is used and

that he knew of no practical use for the subject merchandise other than in radio and television sets.

The evidence as a whole clearly preponderates in establishing that the condensers in controversy are primarily for use in the repair of radio and television sets and are, therefore, in a proper sense, parts thereof, any other uses being minor and exceptional.

As well stated in the brief of plaintiffs—

\* \* \* Practically every part of a radio or television set, in one way or another, controls, distributes, modifies, produces or rectifies electrical energy. Therefore, if the collectors classification were to be upheld, no part of a radio or television apparatus could ever be imported under the lower duty. \* \* \*

Upon the record and for the reasons above stated, the claim of plaintiffs for classification as parts of radio apparatus or parts of television apparatus, which are made dutiable at 12½ per centum ad valorem in paragraph 353, as modified, *supra*, is sustained, and judgment will issue accordingly.